# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

SHANDLE MARIE RILEY,      )
                         )        Lead Case No. 1:19-cv-304
     *Plaintiff*,           )
                         )        Judge Travis R. McDonough
v.                      )
                         )        Magistrate Judge Christopher H. Steger
HAMILTON COUNTY GOVERNMENT, )
DANIEL WILKEY, individually and in his )
capacity as deputy sheriff for Hamilton )
County Government, and JACOB )
GOFORTH, individually and in his )
capacity as deputy sheriff for Hamilton )
County Government, )
                         )
     *Defendants*.        )

---

## MEMORANDUM OPINION

---

Before the Court is Defendant Jacob Goforth's motion for summary judgment (Docs. 411, 414). In this atypical civil-rights case, Plaintiff Shandle Marie Riley brings several claims stemming from a traffic stop that ultimately resulted in her baptism—yes, baptism—by on-duty Hamilton County Sheriff's deputy Defendant Daniel Wilkey. (*See* Doc. 1-1.) Goforth, who was also on duty and was present for the desacralized rite, argues that he is entitled to qualified immunity on Riley's 42 U.S.C. § 1983 claims and that Riley cannot factually support her state-law tort claims against him. (*See* Docs. 411, 412, 414.) For the reasons set forth below, the motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I.      BACKGROUND

On February 6, 2019, around 9:15 p.m., Wilkey pulled Riley over in the driveway of her ex-mother-in-law Diane Smith's home. (Doc. 411-2, at 8; Doc. 412, at 2; Doc. 435, at 9; Doc.

435-1, at 10; *Wilkey Dashcam Video* at 21:15:24[1].)  Wilkey approached Riley's driver-side window and asked her what she had in the car.  (*Wilkey Dashcam Video* at 21:15:46–21:17:35; Doc. 411-2, at 8.)  Riley confessed that she had a marijuana roach in her cigarette pack.  (Doc. 411-2, at 8.)

Wilkey then opened the door for Riley to exit the car and directed her to place her hands on the roof.  (*Wilkey Dashcam Video* at 21:17:37–21:18:13.)  Wilkey searched her person for about twenty seconds and then handcuffed her.  (*Id.* at 21:17:55–21:18:10.)  Another deputy, Tyler McRae, arrived while Wilkey was handcuffing her.  (*Id.* at 21:17:55; Doc. 412, at 2–3.)  After a minute or so of searching, Riley turned around and spoke to Wilkey face-to-face.  (*Wilkey Dashcam Video* at 21:18:13–21:18:47.)  After they spoke, Wilkey searched her pockets and eventually directed her to wait at the front of his patrol car.  (*Id.* at 21:18:47–21:19:13.)  Riley testified that, while searching her this second time, Wilkey inappropriately touched her crotch.  (Doc. 411-2, at 11.)  Wilkey found the marijuana cigarette upon searching Riley's person.  (Doc. 412, at 2–3.)

Wilkey searched Riley's vehicle while she waited near the patrol car.  (*Wilkey Dashcam Video* at 21:19:53–21:30:45.)  According to Riley, Wilkey "tore [her] car apart" searching for other contraband.  (Doc. 411-2, at 8 (clarifying that he did not literally tear anything but that "he searched it very, very well").)  After searching the vehicle and talking with her at length, Wilkey removed the handcuffs.  (*Wilkey Dashcam Video* at 21:47:53–21:48:03.)  He then directed Riley to pull up her shirt and shake out her shirt and bra, which she did.  (*Id.* at 21:48:23–21:49:08.)  Wilkey did not find any additional contraband.

---

[1] The dashcam video contains no audio of Wilkey and Riley's conversations.

Wilkey and Riley next discussed religion. (Doc. 412, at 3.) They spoke for another thirty minutes, and McRae left sometime during this conversation. (*Wilkey Dashcam Video* at 21:49:22–22:19:15.) Riley testified that Wilkey asked her whether she had been baptized. (Doc. 411-2, at 8–9.) She responded with concern that she may not be ready. (*Id.* at 8.) But, according to Riley's testimony, Wilkey told her "God [was] talking to him" and assured her that, if she got baptized, he would only write her a citation and she would be free to go about her business. (*Id.*) According to Riley, Wilkey also indicated that he would speak at court on her behalf if she agreed. (*Id.* at 9.) Riley decided to go along with this plan because she"[did not] want to go to jail." (*Id.*) She also "thought [Wilkey] was a God-fearing, church-like man who saw something . . . in [her], that God talked to him," and testified that "it felt good to believe that for a minute." (*Id.*) When later asked whether Wilkey "gave [her] the option not to do this," Riley answered:

> What do you mean gave me the option? I mean it wasn't, it wasn't by gunpoint . . . or anything. . . . I don't know, like—I'm not sure he told me— I mean, . . . I don't know if those words [came] out. But I mean, I know that I didn't have to do it. I mean, I know that I'm a grown woman and I know I didn't have to do it[.]

(*Id.* at 10.)

Upon Wilkey's suggestion, Riley went into Smith's house to get some towels for the baptism. (*Id.* at 10; *Wilkey Dashcam Video* at 22:19:15–22:19:49.) Riley was only in the house for a couple minutes, where she spoke briefly to her son, and asked Smith if she could borrow some towels. (Doc. 411-2, at 10; *Wilkey Dashcam Video* at 22:19:49–22:23:38) Smith asked why, and Riley responded, "I guess I'm fixing to get baptized." (Doc. 411-2, at 10.) Smith asked her whether that was safe, and Riley replied "I don't know. We'll find out." (*Id.*) After Riley emerged from the house with towels, Wilkey issued her a citation. (*Id.*; *Wilkey Dashcam Video* at 22:23:38–22:24:17.) Riley and Wilkey returned to their respective vehicles, and Riley

followed Wilkey in her car for about twelve minutes to Soddy Lake. (Doc. 411-2, at 8, 10; Doc. 412, at 3; *Wilkey Dashcam Video* at 22:24:21–22:36:59.)

That night, Goforth was also on patrol. (Doc. 411-2, at 38.) Wilkey called Goforth while driving to Soddy Lake "and requested [his] presence at the Soddy Lake boat ramp to witness a baptism." (*Id.* at 38–39.) Goforth believed Wilkey was baptizing someone who he knew personally. (*Id.* at 39.) Goforth did not learn that Riley had been cited for a criminal offense until he arrived at the boat ramp. (*Id.*) Goforth avers that he "asked [Wilkey] if he had thought about [baptizing Riley] in an effort to provoke reconsideration," but that Wilkey "wanted to proceed." (*Id.*)

Wilkey arrived at Soddy Lake around 10:36 p.m. and waited in his car for several minutes. (*Wilkey Dashcam Video* at 22:36:59–22:52:40.) Once Goforth arrived, Wilkey introduced Riley and Goforth to each other, stating that Riley wanted to be baptized. (*Id.* at 22:54:56–22:55:04.) In preparation for the baptism, Wilkey told Riley, "I'm going to be honest with you, . . .I'm going to strip down to my skivvies, " but he asked Riley to keep her clothes on. (*Id.* at 22:55:11–22:55:21 (asking her to "bear with [him]").) Wilkey removed all his clothing except his underwear and t-shirt, and Riley remained fully clothed except for her shoes. (Doc. 411-2, at 10; *Goforth Cellphone Video* at 0:07–0:10.) Wilkey baptized Riley by quickly submerging her in the water while holding her with one hand on her back and the other hand on her front. (Doc. 411-2, at 10; *Goforth Cellphone Video* at 0:49–1:36.)

Goforth filmed the baptism on his cellphone. (Doc. 411-2, at 39.) Goforth avers that he did so "to protect all persons present and document the event." (*Id.* (also stating that he "thought that making the video would prevent Riley from claiming something happened which did not").) There is some dispute as to where Wilkey was touching Riley during the actual baptism: Riley

stated one of his arms was touching her breast (*id.* at 10, 14–15), but in the video Goforth took of the baptism, it appears as though Wilkey was only holding her arm (*Goforth Cellphone Video* at 0:49–1:36). Wilkey and Riley were in the water for approximately one minute and twenty seconds total. (*Id.* at 0:26–1:45; Doc. 411-2, at 11.)

Once out of the water, Riley and Wilkey hugged each other for roughly four seconds. (*Goforth Cellphone Video* at 1:58–2:02; Doc. 411-2, at 10.) When asked why she had hugged Wilkey, Riley testified that she "was just trying to get the heck out of there," and that she left immediately without talking with Wilkey or Goforth. (Doc. 411-2, at 10–11.) Riley also testified that Goforth smirked at her while she was drying herself off, though Goforth denies interacting with her in any way. (*Id.* at 10, 39.) Riley further stated that, at that point, "[she] knew it had nothing to do with God [or] . . . with saving [her or] . . . with [anyone] being a good person. It had something to do with power and control[.]" (*Id.* at 10.) Goforth avers that "Wilkey and Riley spoke pleasantly to each other[,] laughing and joking among themselves" and that Riley "appeared to be participating in the event voluntarily and with enthusiasm." (*Id.* at 39.) At 11:00 p.m., all three walked back to their vehicles. (*Wilkey Dashcam Video* at 23:00:32–23:00:53.) There was some conversation and laughter before Riley departed, and Goforth and Wilkey continued talking after she left. (*Id.* at 23:00:58–23:07:25.)

On September 31, 2019, Riley filed this action in the Circuit Court for Hamilton County, Tennessee (Doc. 1-1), and, on October 29, 2019, Defendant Hamilton County removed the action with Wilkey and Goforth's consent (Doc. 1). Riley asserts the following claims:

1. 42 U.S.C. § 1983 claim for violation of her First Amendment right to freedom of religion against Wilkey and Goforth, in their individual and official capacities, and against Hamilton County;

2. 42 U.S.C. § 1983 claim for failure to protect and render aid against Wilkey and Goforth, in their individual and official capacities, and against Hamilton County;

3. 42 U.S.C. § 1983 claim for violation of her Fourth Amendment right to be free from unreasonable seizures against Wilkey and Goforth, in their individual and official capacities, and against Hamilton County;

4. 42 U.S.C. § 1983 claim for violation of her Fourth Amendment right to be free from unreasonable searches against Wilkey and Goforth, in their individual and official capacities, and against Hamilton County;

5. Negligence against Wilkey and Goforth, in their individual and official capacities, and against Hamilton County;

6. Battery against Wilkey and Goforth in their individual capacities;

7. Battery against Wilkey in his individual capacity;

8. Assault against Wilkey and Goforth in their individual capacities;

9. Assault against Wilkey in his individual capacity; and

10. Intentional infliction of emotional distress against Wilkey and Goforth in their individual capacities.

(Doc. 1-1, at 12–25.) Goforth moves to dismiss all of Riley's claims against him, and his motion is ripe for adjudication. (Docs. 411, 414.)

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out

6

the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III.    ANALYSIS

### A.    Section 1983 Claims[2]

42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any . . . person . . .to the deprivation of any rights ... secured by the Constitution and laws [of the

---

[2] Riley brings each of her § 1983 claims against Goforth in both his individual and official capacities. However, suits brought against local officers in their official capacities under § 1983 are treated, "in all respects other than name," as suits against the government entity, "[a]s long as the government entity receives notice and an opportunity to respond." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Monell v. Dep't Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]"). In this case, Hamilton County has had notice and an opportunity to respond, so the claims against Goforth in his official capacity are effectively claims against the County. Because Hamilton County is also named as a defendant on each official-capacity claim against Goforth, the claims against him in his official capacity are redundant and can properly be dismissed.

United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Riley asserts § 1983 claims against Goforth based on (1) violation of her freedom of religion, (2) failure to protect and render aid, (3) unreasonable seizure, and (4) unreasonable search. (Doc. 1-1, at 12–22.) To succeed on these claims, Riley must show (1) that "she was deprived of a right secured by the Constitution or laws of the United States" and (2) "that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citations omitted). Only the first element is disputed with respect to Riley's claims against Goforth. Goforth argues that he is entitled to qualified immunity, and, thus, summary judgment on each of the federal claims. (Doc. 412, at 8–17.)

The doctrine of qualified immunity "shields governmental officials from monetary damages as long as their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017) (internal quotation marks omitted). In deciding whether a defendant is entitled to qualified immunity at the summary-judgment stage, the Court employs a two-part test, which may be conducted in either order. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). First, the Court determines whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right. *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2012). Second, if a constitutional right was violated, the Court determines whether the right was clearly established at the time the violation occurred. *Id.* The plaintiff bears the burden of "satisfy[ing] both inquires in order to defeat the assertion of qualified immunity." *Sumpter*, 868 F.3d at 480.

###### i. *Unreasonable Search*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, paper, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Goforth argues that Riley's unreasonable-search claim fails because he was not present for any search of Riley and did not himself touch, speak to, or meaningfully interact with her. (Doc. 412, at 8–9.) Riley responds that Goforth is liable because he engaged in a civil conspiracy with Wilkey to violate her Fourth Amendment rights. (Doc. 435, at 21–22.)

Riley failed to plead a civil conspiracy in her complaint or otherwise give notice to Goforth that she was pursuing this theory of liability before responding to the motion for summary judgment. This is sufficient grounds for the rejection of her claim.[3] *See Townsend v.*

---

[3] Even if the Court were to consider this theory of liability, her unreasonable-search claim still fails. "A civil conspiracy under § 1983 is 'an agreement between two or more person to injure another by unlawful action.'" *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)). To succeed on a § 1983 conspiracy claim, a plaintiff must show "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintif[f] of [her] constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis*, 489 F.3d at 290) (internal quotation marks omitted). A plaintiff need not demonstrate that there was "an express agreement among all the conspirators, and 'each conspirator need not have known all of the details of the illegal plan or all the participants involved.'" *Id.* (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). At summary judgment, a plaintiff can rely on circumstantial evidence to show an agreement was made, *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012), but there must be a genuine issue of material fact as to each element to avoid summary judgment.

Riley argues that Wilkey and Goforth had a single plan "to baptize [her] while Wilkey was on duty." (Doc. 435, at 22.) Riley further argues that Goforth "knew or should have known that the entire sordid event was wrong" and that "[h]is failure to report furthered Wilkey's misconduct by enabling Wilkey." (*Id.*) On these grounds, she asserts that "Goforth is responsible for everything that occurred from the time Wilkey 'searched' Riley to the time he dunked her into the cold waters of the lake." (*Id.*) Riley's argument fails because she does not contend that a plan was formed prior to the search of Riley's vehicle and person at Smith's house. (*See id.*) In her own recitation of the facts, she recounts that Wilkey and Goforth's first interaction relative to these events was a phone call between 11:00 p.m. and midnight, well after the search at Smith's. (*Id.* at 6.) Based on the evidence in the record, no reasonable jury could

*Rockwell Auto., Inc.*, 852 F. App'x 1011, 1013 (6th Cir. 2021) (declining "to consider issues not raised in her original or amended complaint because they have not been properly pleaded"); *cf. Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal.").

Because no reasonable jury could find that Goforth violated Riley's Fourth Amendment right to be free from unreasonable searches, Goforth is entitled to qualified immunity and summary judgment on this claim. *See Sumpter*, 868 F.3d at 480. The Court will therefore **GRANT** Goforth's motion with respect to Riley's unreasonable-search claim.

### ii. Unreasonable Seizure

Riley's unreasonable-seizure claim, however, raises additional legal questions. Any claim based on the initial seizure—*i.e.*, the traffic stop in Smith's driveway—fails as against Goforth for the same reasons as the unreasonable-search claim. However, a review of Riley's complaint indicates that her unreasonable-seizure claim primarily pertains to the seizing of Riley's person for the purpose of the baptism. (*See* Doc. 1-1, at 17–19.) Goforth raises two arguments concerning this claim: that Riley was not seized during the baptism and that, even if she was seized, the seizure is not attributable to him. (Doc. 412, at 8–9.)

_____

find that Wilkey and Goforth formed a conspiracy to unreasonably search Riley before Wilkey initiated the search at Smith's house. *See Bazzi v. City of Dearborn*, 658 F.3d 598, 603 (6th Cir. 2011) (holding that mere "vague and conclusory allegations unsupported by material facts" are insufficient to withstand summary judgment on a civil-conspiracy claim). Riley provides no support for her assertion that Goforth is liable for Wilkey's conduct prior to the formation of the alleged conspiracy, nor does she attempt to distinguish cases in this circuit that suggest otherwise. *See, e.g., Green v. Taylor*, No. 1:03 CV 1804, 2006 WL 8448445, at *25 (N.D. Ohio Apr. 11, 2006) ("In this case, there is no evidence of a conspiracy to commit a constitutional violation, since the alleged constitutional violation took place prior to the beginning of the alleged conspiracy.").

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains [her] freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (cleaned up).  Some interactions between individuals and law-enforcement officers, such as traffic stops or arrests, more obviously constitute seizures.  But when "unambiguous intent to restrain" is lacking or "when an individual's submission to a show of governmental authority takes the form of passive acquiescence," it can be unclear whether a seizure occurred.  *Brendlin*, 551 U.S. at 255.  In such cases, the Court asks whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave" or "would feel free to decline the officers' requests or otherwise terminate the encounter."  *Id.* (citations and internal quotation marks omitted).  If so, a seizure has occurred.  *Id.*

When a suspected seizure is affected without the use of physical force, there must be both a show of authority from the officer and submission by the detainee.  *United States v. Ward*, 756 F. App'x 560, 564 (6th Cir. 2018) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).  "[W]hat may amount to submission depends on what a person was doing before the show of authority[.]"  *Brendlin*, 551 U.S. at 262 ("[A] fleeing man is not seized until he is physically overpowered but one sitting in a chair may submit to authority by not getting up to run away.").  The Supreme Court has noted that "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" can connote a seizure, even when the individual never attempted to leave.  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (citations omitted).  However, "[i]n the absence of some

such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 555.

Goforth argues that Riley was no longer seized when she arrived at the boat ramp for the baptism because she drove her own car to the lake and "was no longer physically restrained in any way." (*Id.* at 9.) But genuine fact issues preclude summary judgment on this basis. Because of the absence of audio in the dashcam footage, the specifics of the conversation that led to the baptism are unclear. Although Goforth contends that, from his perspective, Riley freely consented to the baptism, Riley denies this. (*See* Doc. 411-2, at 8–9.) And taking the facts in the light most favorable to Riley, a reasonable person under the circumstances could have believed she was not free to leave until the baptism was completed. Riley had already been pulled over, handcuffed, and detained for nearly two hours by an on-duty, uniformed officer driving a marked police vehicle. (*Wilkey Dashcam Video* at 21:15:24–22:24:21.) She had surrendered marijuana she knew she was not legally allowed to have. (Doc. 411-2, at 8.) Riley also testified that she went along with the baptism at least in part because she did not want to go to jail. (*Id.* at 8.) She further testified that Wilkey told her that, if she agreed to be baptized, "he'd give [her] a citation and [she] could go on about [her] business." (*Id.*) Wilkey had also called and requested the presence of an additional on-duty officer for the baptism. (*Id.* at 38–39.) It would not be unreasonable for a person facing these circumstances to believe that, if she attempted to leave before the baptism was over, she would have been prevented from doing so. Accordingly, Goforth is not entitled to summary judgment on the grounds that Riley was not seized for the purposes of the baptism.

Though Goforth's argument rests primarily on the absence of a seizure, the Court notes that only unreasonable seizures violate the Fourth Amendment. *See Mendenhall*, 446 U.S. at 553–54 ("The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976))).  "[W]hat is 'unreasonable' varies from case to case, from type of seizure to type of seizure." *Graves v. Mahoning Cnty.*, 821 F.3d 772, 775 (6th Cir. 2016).  To determine the reasonableness of an officer's conduct, the Court balances "the governmental interest which allegedly justifies official intrusion" against the intrusiveness of the seizure on the individual's rights. *Terry v. Ohio*, 392 U.S. 1, 20–21 (1968) (citations and internal quotation marks omitted).

If the facts demonstrate that Riley was seized, that seizure will have been unreasonable. No government interest is furthered by the baptism of a detainee by an on-duty law-enforcement officer.  To the contrary, "[i]t is beyond dispute that, at a minimum, the Constitution guarantees that the government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith or tends to do so." *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (cleaned up).  "[I]f citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Id.* at 592.  Baptism of detainees by law-enforcement officers runs directly counter to the government's substantial interest in guaranteeing the free exercise of religion without government intervention.  Any

seizure for the purpose of conducting a baptism intruded upon Riley's liberty without furthering any government interest and was therefore unreasonable.

c. Goforth's Liability for the Seizure

Although a jury could find that Riley was subject to an unreasonable seizure, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008)). An officer is liable for a Fourth Amendment violation if the plaintiff shows that he or she "(1) actively participated in the [violation], (2) supervised the officer who [carried out the violation], or (3) owed the victim a duty of protection against the [constitutional violation]." *Id.* (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Riley makes no argument concerning Goforth's active participation or his supervisory capacity. (*See* Doc. 435.) Accordingly, the Court will not consider whether Goforth is liable under either of these theories. Instead, the Court considers only whether Goforth is liable for failing to intervene despite owing Riley a duty of protection.[4]

The Sixth Circuit has repeatedly held that an officer can be liable for his failure to intervene and stop another officer's use of excessive force. *See, e.g.*, *Batson v. Hoover*, 788 F. App'x 1017, 1021 (6th Cir. 2019); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). In the excessive-force context,

> a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that the excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

*Turner*, 119 F.3d at 429 (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Though

---

[4] Because the Court has already identified Riley's failure to plead civil conspiracy as a theory of liability, the Court will not consider her argument that Goforth is liable under this theory.

the test has been most frequently applied in that context, the Sixth Circuit has recognized that officers can be liable for failure to intervene to prevent other constitutional harms as well. *Bunkley v. City of Detroit*, 902 F.3d 552, 565–66 (6th Cir. 2018) (affirming denial of qualified immunity for officers who failed to stop a wrongful arrest by another officer); *Jacobs v. Village of Ottawa Hills*, 5 F. App'x 390, 395–96 (6th Cir. 2001) (acknowledging that officers can be liable for failing to prevent unreasonable seizures by other officers); *Smith v. Ross*, 482 F.2d 33, 36–37 (6th Cir. 1973) (holding that an officer "can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly" and that "acts of omission are actionable in this context to the same extent as acts of commission"). The Sixth Circuit has also favorably cited district court cases applying the test in broader constitutional contexts. *See Bunkley*, 902 F.3d at 565–66 (quoting *Holloran v. Duncan*, 92 F. Supp. 3d 774, 793 (W.D. Tenn. 2015); *Kaylor v. Rankin*, 356 F. Supp. 839, 850 (N.D. Ohio 2005)). These district courts adapted the test for a more general application:

> In order to succeed on a failure to intervene claim, a plaintiff must demonstrate that the officers (1) observed or had reasons to know that [the constitutional harm] would be or was being used, and (2) had both the opportunity and the means to prevent the harm from occurring.

*Holloran*, 92 F. Supp. 3d at 793 (quoting *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014)) (alteration in original); *see also Kaylor*, 356 F. Supp. 3d at 850 ("An officer who fails to intervene[] is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that any constitutional violation has been committed" as long as he "had a realistic opportunity to intervene to prevent the harm from occurring.").

Goforth concedes that law-enforcement officers can be subject to a duty to intervene and stop fellow officers from violating the constitutional rights of individuals but contends that the

duty was not triggered in this case.  (Doc. 412, at 9.)  Goforth first argues that he had no

obligation to intervene because no constitutional violation occurred.  (Doc. 412, at 11

("Performing a baptism while on duty as a police officer with a willing participant . . . is not a

violation of the Plaintiff's rights[.]").)  But the Court has already determined that a reasonable

jury could find that the seizure for the purposes of the baptism violated Riley's Fourth

Amendment rights.  Accordingly, the alleged lack of constitutional violation is not a viable basis

for finding that Goforth had no duty to intervene.

Goforth also argues that he did not have a duty to intervene, because the alleged coercion

occurred at Smith's residence and he "did not know, and could not have known," what had

transpired before his arrival.  (Doc. 412, at 13–14.)  It is true that, in some circumstances, an

officer's obligation to intervene does not extend to questioning a fellow officer about

occurrences prior to his arrival.  *See Jacobs*, 5 F. App'x at 395–96.  In *Jacobs*, the Sixth Circuit

held that an officer did not violate clearly established law based on his failure to intervene and

stop a baseless seizure when the officer arrived after the seizure had begun and *"did not observe*

*or have reason to know the basis for [the other officer's] seizure*."  *Id.* (emphasis added).  But

the same cannot be said for Goforth.  He was made aware of the purpose of the encounter prior

to his arrival, and a reasonable jury could find that he should have known Riley was

unreasonably seized under the circumstances.  Goforth knew that he and Wilkey were both on

duty and learned that Riley had just been cited for possession of marijuana.  Some of the

language Wilkey used after Goforth arrived could also have put Goforth on notice that Riley was

seized.  (*See Wilkey Dashcam Video* at 22:54:58–22:55:33 (Wilkey directing Riley, "You please

keep your clothes on" and telling Goforth to "watch [Wilkey's] back" while he removed his

clothes).)  On these bases, a jury could find that Goforth had reason to know that Riley had been

seized. *See Mendenhall*, 446 U.S. at 554 (noting that "the threatening presence of several officers" and "the use of language or tone of voice indicating that compliance with the officer's request might be compelled" can indicate a seizure."). And any reasonable officer in Goforth's position would have known that a baptism is an improper basis for a seizure. *See Lee*, 505 U.S. at 592.

As to the second element, Goforth has not argued that he lacked means or an opportunity to intervene, and a reasonable jury could also find that he had both. Goforth avers that, after he realized Riley had been cited for a criminal offense, he asked Wilkey if he had thought through the decision to baptize her "in an effort to provoke reconsideration." (Doc. 414-2, at 39.) This supports finding that he had the opportunity to speak to Wilkey before the baptism occurred. A jury could therefore find that Goforth had reason to know of a constitutional violation and an opportunity to stop the violation such that he is liable for his failure to intervene.

<u>d.</u>    <u>Whether Goforth's Actions Violated Clearly Established Law</u>

Having determined that a reasonable jury could find Goforth violated Riley's Fourth Amendment right to be free from unreasonable seizures by failing to intervene, the Court considers whether his conduct violated a clearly established right.

A right is clearly established when, "at the time of the challenged conduct, the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations omitted). Courts should not attempt to define a particular right at a high level of generality. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *al-Kidd*, 563 U.S. at 741). Instead, they should assess whether it is clearly established that the particular conduct is unconstitutional.

*Id.* ("This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (citations and internal quotation marks omitted)). Still, "[i]t is not necessary, . . . 'that the very action in question has previously been held unlawful.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also id.* at 1867 ("[A]n officer might lose qualified immunity even if there is no reported case 'directly on point.'" (citations omitted)). That is, "there need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts," as long as the defendants had "fair warning" that their conduct violated the plaintiff's rights. *Goodwin v. City of Painsville*, 781 F.3d 314, 325 (6th Cir. 2015) (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

Courts in this Circuit have found that it was clearly established in 2018 "that an officer has a 'duty to intervene when another officer is unlawfully seizing an individual.'" *Clemons v. Cothron*, No. , 2021 WL 694183, at *18 (M.D. Tenn. Feb. 23, 2021) (quoting *Adeeko v. Chattanooga Metro. Airport Auth.*, No. 1:19-cv-113, 2020 WL 1442875, at *8 (E.D. Tenn. Mar. 24, 2020)); *see also Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006) ("Those present for an unconstitutional seizure can also be held liable for failure to protect."). In *Bunkley*, the Sixth Circuit held that it was clearly established that law-enforcement officers have a duty to intervene "to prevent an arrest not supported by probable cause." 902 F.3d at 566. In so concluding, the court favorably quoted portions of *Kaylor* and *Holloran*—district-court opinions finding that an officer's duty to intervene to prevent unlawful arrest was clearly established in 2003 and 2012, respectively. *See* 356 F. Supp. 2d at 851; 92 F. Supp. 3d at 794–95. The courts in *Bunkley*,

*Kaylor*, and *Holloran* found that the duty to intervene was clearly established in that particular context by relying on cases addressing the duty to intervene in other constitutional contexts. *See Holloran*; 92 F. Supp. 3d at 794–95 (citing *Ross*, 482 F.2d at 36–37 ( recognizing an officer's duty to intervene to stop another officer from violating an individual's equal-protection rights); *Kaylor*, 356 F. Supp. 2d at 851 (citing *Bruner*, 684 F.2d at 426 (recognizing that an officer could be liable for failure to intervene in an excessive-force case); *see also Bunkley*, 902 F.3d at 566 (quoting the portions of *Holloran* and *Kaylor* citing these cases).

Based on these cases and those cited therein, the Court finds that Goforth's duty to intervene to stop an unreasonable seizure in violation of Riley's Fourth Amendment right was clearly established at the time of the events in this case. Goforth stresses the exceptionality of the facts of this case. (*See* Doc. 412, at 17 ("The very nature of the uniqueness of this event makes it impossible for Goforth to have had any guidance in his training or experience as to how to address the situation presented to him.").) But the lack of factually similar cases does not automatically confer qualified immunity. *See Ziglar*, 137 S. Ct. at 1867; *Hope*, 536 U.S. at 741; *Goodwin*, 781 F.3d at 325. And like the courts deciding *Bunkley*, *Holloran*, and *Kaylor*, the Court may rely on cases decided in other constitutional contexts to find that the duty to intervene to stop a Fourth Amendment violation of any kind was clearly established at the time of the events in this case. The Sixth Circuit and district court opinions at the time gave Goforth fair warning that he had a duty to intervene to stop Wilkey from committing an unreasonable seizure. And, if anything, the truly bizarre nature of these facts should have put Goforth further on notice that the seizure was inappropriate. *See Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) ("Some violations of constitutional rights are so obvious that a 'materially similar case' is not required for the right to be clearly established." (citing *Brosseau v. Haugen*, 543 U.S. 194, 199

(2004)).   Accordingly, Goforth is not entitled to qualified immunity on Riley's Fourth

Amendment claim for unreasonable seizure, and the Court will deny his motion for summary

judgment as to this claim.

### iii.  *First Amendment Violation*

The First Amendment prohibits the government from "respecting an establishment of

religion" or "prohibiting the free exercise thereof."  U.S. CONST. amend I.  Pursuant to the

Establishment Clause, "the government may neither officially promote religion, nor harbor 'an

official purpose to disapprove of a particular religion or of religion in general.'"  *Satawa v.*

*Macomb Cnty. Rd. Comm'n*, 689 F.3d 506, 526 (6th Cir. 2012) (quoting *Church of the Lukumi*

*Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993)).

Goforth does not argue that Riley's baptism was constitutional.  Instead, he seeks

summary judgment on the ground that his conduct did not violate clearly established law.  (Doc.

412, at 15–17.)  The Court first considers whether Riley's baptism violated clearly established

law and then whether it was clearly established that Goforth would be liable for a violation.

### a.  Unconstitutionality of the Baptism

The Supreme Court announced the primary test for constitutionality under the

Establishment Clause in  *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  Under the *Lemon* test, a

challenged government action must:  (1) "have a secular legislative purpose"; (2) have a

"principal or primary effect . . . that neither advances nor inhibits religion"; and (3) "not foster an

excessive government entanglement with religion."  *Id.* at 612–13.  The first prong is subjective

and concerns "whether the government's actual purpose is to endorse or disapprove of religion."

*Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 587 (6th Cir. 2015) (quoting *Lynch*

*v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)).  The second prong is

objective:  "[i]t asks 'whether, irrespective of government's actual purpose, the practice under

review in fact conveys a message of endorsement or disapproval.'" *Id.* (quoting *Lynch*, 465 U.S. at 690). Under the first two prongs, "[i]f either the purpose or effect of the government activity is to endorse or disapprove of religion, the activity is unconstitutional." *Id.* The Sixth Circuit has referred to analysis under these prongs as the "endorsement test." *See id.* (quoting *Granzeier v. Middleton*, 173 F.3d 568, 573 (6th Cir. 1999)). A governmental act that passes the endorsement test can still be unconstitutional under the final prong if it is excessively entangled with religion. *Id.* However, the Supreme Court has advised the "entanglement" prong is better cast as "simply one criterion relevant to determining [the] effect" of a government activity, rather than a stand-alone test for constitutionality. *See Mitchell v. Helms*, 530 U.S. 793, 807–08 (2000) (citing *Agostini v. Felton*, 521 U.S. 203, 232–33 (1997)).

Religious activities proximate to government functions do not *per se* violate the Establishment Clause. *See Lee*, 505 U.S. at 597 (noting that Establishment Clause jurisprudence is "delicate" and "fact sensitive"). However, "[t]he Supreme Court has made clear that the state endorses religion when it coerces participation in a religious activity." *Smith*, 788 F.3d at 589. Coercion includes "securing participation through rules and threats of punishments" as well as "imposing public pressure or peer pressure on individuals." *Id.* (citing *Santa Fe Indep't Sch. Dist. v. Doe*, 530 U.S. 290 (2000)). Courts have found coercion by state actors when participation in a religious exercise was required as well as when a benefit is conditioned on participation in the religious exercise. *See Lee*, 505 U.S. at 596 (holding it was coercive to make public-school student choose between attending their graduation or being subjected to religious dialogue during the ceremony); *Santa Fe Indep't Sch. Dist.*, 530 U.S. at 312 (holding it was coercive to make students choose between attending their high school football games or being subjected to school-sponsored prayer at the beginning of each game).

The Court finds that, although there is no case directly on point, the law was sufficiently clear in February 2019 that any reasonable officer would have recognized that coerced participation in a Christian baptism—an overtly religious act with no secular purpose—was unlawful. *See Lee*, 505 U.S. at 596 ("It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice."); *see also Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38, 44 (1st Cir. 2016) ("Among the 'essential precepts' of the Establishment Clause [is] that 'neither a state nor the Federal Government can force a person to profess a belief or disbelief in any religion[.]'" (cleaned up)). There are genuine disputes of material fact concerning whether Riley was coerced into the baptism, whether she would have faced harsher penalties had she refused to be baptized, and whether Goforth should have known that Riley was being coerced. This is enough to preclude summary judgment on this issue.

Even if Riley was not coerced into the baptism, "the absence of coercion does not end the inquiry" under the Establishment Clause. *Smith*, 788 F.3d at 589 ("Even if the government does not compel citizens to actually *participate* in the religious observances, the government may endorse religion, and thus offend the Constitution, in other ways."). A state actor improperly endorses religion "if a reasonable observer would think that that the activity is a governmental endorsement of religion." *Id.* (citing *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment); *Granzeier*, 173 F.3d at 573). Under this test, the "reasonable observer" is "deemed aware of the history and context of the community, as well as the context in which the challenged government activity took place." *Id.* (quoting *Pinette*, 515 U.S. at 780). Applying this test, courts have found that the government endorses religion when the act at issue is inherently religious in nature. *See, e.g.*,

*Sch. Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 223 (1983) (holding that the reading of Bible verses and recitation of the Lord's Prayer violated the Establishment Clause because of the "religious character" of the activities); *Stone v. Graham*, 449 U.S. 39, 41–43 (1980) (holding a school's posting of the Ten Commandments on schoolroom walls was unconstitutional because "[t]he pre-eminent purpose . . . is plainly religious in nature"); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1285 (11th Cir. 2004) ("Because prayer is a primary religious activity in itself, a teacher or administrator's intent to facilitate or encourage prayer in a public school is *per se* an unconstitutional intent to further a religious goal." (cleaned up)).

A baptism, too, is an unambiguously religious practice that does not have a conceivable secular purpose. *See Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1304 (11th Cir. 2007) (Tjoflat, J., dissenting) ("[B]aptism is a well-known theological sacrament[.]"); *see also Jager v. Douglas Cnty. Sch. Dist.*, 862 F.2d 824, 830 (11th Cir. 1989) ("[A]n intrinsically religious practice cannot meet the secular purpose prong of the *Lemon* test[.]"). There is no indication in the record that either officer understood or intended the baptism as anything but an exercise of faith and religion. Any reasonable observer would conclude that the effect of the baptism was an unequivocal endorsement of Christianity. Consequently, Goforth had fair warning at the time that the baptism of a private citizen by an on-duty law-enforcement officer was an improper endorsement of religion.

### b.     Goforth's Liability

Goforth contends that his duty to intervene to stop the baptism was not triggered, because he did not know or have reason to know that Riley had been coerced into the baptism. (Doc. 412, at 13.) But, as the Court has explained, "the absence of coercion does not end the inquiry," and Goforth can still be liable for failing to intervene if a reasonable observer would have

understood that the baptism was a governmental endorsement of religion. *Smith*, 788 F.3d at 589.

Here, a reasonable observer, aware of the history, context, and purpose of a baptism, would plainly perceive a baptism by a uniformed, on-duty state officer as an endorsement of religion even if the baptism were voluntary. Goforth clearly understood that the baptism was religious in nature. (*See* Doc. 435-1, at 18–19 (Goforth testifying that he was raised Baptist and follows the Christian faith and that he was aware that baptism was a religious ceremony associated with Christianity).) Yet he insists that there was no violation of the Establishment Clause because it seemed to him that the baptism was voluntary. (Doc. 412, at 15.)

Other courts have held that similar religious displays by law-enforcement officers in the context of their work are properly deemed state-sponsored actions. *See, e.g.*, *Marrero-Méndez*, 830 F.3d at 44 (concluding that a group prayer by law-enforcement officers during an official intervention meeting was "unmistakably a state action"); *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 529 (7th Cir. 2009) (county sheriff unconstitutionally endorsed religion by inviting a Christian organization to discuss matters that included religion at mandatory meetings); *Rojas v. City of Ocala*, 315 F. Supp. 3d 1256, 1283–85 (M.D. Fla. 2018) (police chief's involvement in and endorsement of community prayer vigil was an improper endorsement of religion). And the record establishes that Goforth knew Riley was being baptized, that she had been cited for a criminal violation, and that Wilkey was an on-duty sheriff's deputy. Accordingly, Goforth had reason to know that Wilkey was violating Riley's constitutional rights, and, thus, his duty to intervene was triggered.

Goforth also points to the lack of cases establishing "that a law enforcement officer would have a duty to intervene under [] similar circumstances." (Doc. 412, at 16.) Although

there is no case directly on point, this case is one in which the unconstitutional nature of Wilkey's conduct was "so patently evident that no particular case—and certainly not one directly on point—need have existed to put a reasonable officer on notice of its unconstitutionality." *Marrero-Méndez*, 830 F.3d at 47 (citations and internal quotation marks omitted); *see also id.* at 46 ("Where, as here, a religious practice is conducted by a state official at a state function, state sponsorship is so conspicuously present that only the plainly incompetent or those who knowingly violate the law would deny it." (cleaned up)). Though there appear to be no cases directly addressing the circumstances Goforth faced, the Court concludes that, based on the state of the law at the time, Goforth had fair warning that he had a duty to intervene to stop constitutional violations of this nature. And a reasonable jury could conclude that Goforth had both notice of the violation and an opportunity to stop the baptism. Accordingly, Goforth is not entitled to summary judgment on Riley's First Amendment claim.

### iv. *Failure to Protect and Render Aid*

With regard to her § 1983 claim for failure to protect and render aid, Riley argues that Goforth had a duty to protect her during the events of this case and that his failure to intervene violated her right to due process. (Doc. 435, at 12–14.) Riley's failure-to-protect-and-render-aid claim is also based on Goforth's alleged violation of a "non-delegable dut[y] to report the misconduct of [his] fellow defendan[t] to the command staff of the County's sheriff's department." (Doc. 1-1, at 15.) Goforth argues that there is no constitutional duty to report and that he had no duty to protect under the circumstances. (Doc. 412, at 17–18; Doc. 438, at 6–7.)

### a. Duty to Protect

"[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the

government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 196 (1989) ("Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference, it does not confer an entitlement to such governmental aid as may be necessary to realize all the advantages of that freedom." (cleaned up)). Nevertheless, there are circumstances in which an individual is entitled to affirmative government intervention under the Due Process Clause. *See Sexton v. Cernuto*, 18 F.4th 177, 186 (citing *DeShaney*, 489 U.S. at 200). The first notable exception to the general rule—the "special-relationship" exception—applies when the state deprives an individual of her liberty by holding her in custody against her will. *Id.* (citing *DeShaney*, 489 U.S. at 200). The second exception—the "state-created-danger" exception— applies "when 'the state takes an affirmative act that increases the victim's risk of harm' from private acts of violence." *Id.* (quoting *Lipman v. Budish*, 974 F.3d 726, 733 (6th Cir. 2020)).

Riley argues that Goforth's duty to protect was triggered because he "was a willing participant in a state created zone of danger." (Doc. 435, at 12–13.) She argues that Wilkey increased her risk of harm "by coercing Riley into following him to the lack for a baptism," and that Goforth is liable because he personally participated in the baptism. (*Id.*)

"Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (citations omitted). The Sixth Circuit has held that, for such liability to attach, the state actor must know or clearly have reason to know that his actions "specifically endangered an individual." *Id.* Goforth argues that Riley has not pointed to a single act by him that created or increased a risk to her. (Doc. 438, at 7.)

The Court agrees that no act of Goforth created or increased the danger to Riley. There is nothing in the record indicating that his presence at the lake or filming of the baptism made it more likely that Wilkey would cause Riley physical harm. To the contrary, Goforth testified that he filmed the baptism for the protection of those involved. (Doc. 411-2, at 39.) Riley herself contends that it was Wilkey—not Goforth—who created the dangerous situation. (Doc. 435, at 13.) Because Riley has not shown that there are genuine issues of fact precluding summary judgment, the Court will **GRANT** Goforth's motion with respect to this claim.[5]

b.       Duty to Report

Goforth also moves for summary judgment with regard to Riley's failure-to-report claim, arguing that law-enforcement officers have no constitutional duty to report. (Doc. 412, at 1.) In defense of her claim, Riley argues that, by failing to report the incident, Goforth participated in a "code of silence" sufficient to give rise to a cause of action under § 1983. (Doc. 435, at 21 (citing *Brandon v. Allen*, 645 F. Supp. 1261, 1269 (W.D. Tenn. 1986)).) But *Brandon*, on which she relies, considered whether a policy or practice of "silence," or failing to report misconduct, among officers of the Memphis Police Department was a "custom" that could subject the city to *Monell* liability. 645 F. Supp. at 1263–69 (considering whether the plaintiffs had shown a "policy or custom" sufficient to establish official-liability capacity of an officer); *see also Graham*, 473 U.S. at 165–66 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated

---

[5] Riley argues that Wilkey's criminal indictment is evidence of "a continuing course of criminal conduct that Goforth engaged in [and] . . . failed to report." (Doc. 435, at 13.) But Wilkey's criminal indictment, for which he has not yet had a trial, has no evidentiary weight in this civil case. Moreover, Goforth was not indicted for the events involving Riley. Thus, even if the Court could consider the accusations in the indictment, they would have no bearing on Riley's failure-to-protect claim against Goforth.

as a suit against the entity."). The Court, however, is considering Goforth's individual liability, not the County's. *See supra* n.4. Accordingly, *Brandon* is inapplicable and is not a sufficient basis for finding that Goforth is liable under § 1983 for failure to report.

Riley next argues Goforth is liable for his failure to report based on the Hamilton County Sheriff's Department's subsequent determination that he violated departmental policy by failing to report the incident. (Doc. 435, at 21.) But, without more, the failure to comply with internal policy does not amount to a constitutional violation. *See Meier v. Cnty. of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010) (holding that a violation of departmental policy "is not a per se constitutional violation"). Because Riley has provided no support for her assertion that Goforth's failure to report exposed him liability under § 1983, the Court will **GRANT** Goforth's motion for summary judgment to the extent it seeks dismissal of this claim.

## B. Tort Claims

Goforth also moves for summary judgment on Riley's claims for negligence, battery, assault, and intentional infliction of emotional distress. (Doc. 411.) Riley argues that Goforth is liable for each of the state tort claims on the basis that he formed a civil conspiracy with Wilkey.[6] (Doc. 435, at 22–23.) She claims that Goforth acted in furtherance of the conspiracy by being present and recording the event and that he is therefore liable along with Wilkey. (Doc. 435, at 23.) Riley does not cite any elements of the tort claims or discuss how Goforth is liable for any of these torts. (*See id.*)

In Tennessee, a civil conspiracy is an independent cause of action in Tennessee that must be pled with specificity. As the Court has already pointed out, Riley did not plead civil

---

[6] Riley also cites the standard by which one individual is criminally responsible for another's conduct and argues that Goforth is liable as a coconspirator under Tennessee criminal law. (Doc. 435, at 22.) However, the criminal standard is irrelevant to her civil claims.

conspiracy as a basis for liability in this case, and she may not amend her complaint in a response brief. Moreover, even if Riley could proceed under this theory, she has failed to point to evidence that the elements of the underlying torts are met. Her failure to do so is an independent basis for rejecting her civil-conspiracy argument. *See Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) ("Conspiracy, standing alone, is not actionable where the underlying tort is not actionable.').

Because Riley has not pointed to any facts from which a reasonable jury could conclude that Goforth is liable for negligence, battery, assault, or intentional infliction of emotional distress, Goforth's motion will be **GRANTED** with respect to these claims.

## IV.     CONCLUSION

For these reasons, Goforth's motion for summary judgment (Doc. 411) is **GRANTED IN PART** as to Riley's claims against him individually for unreasonable search, failure to protect and render aid, negligence, battery, assault, and intentional infliction of emotional distress. These claims are hereby **DISMISSED**. Moreover, because all the claims against Goforth in his official capacity are duplicative of his claims against Hamilton County, those claims are also **DISMISSED**. Goforth's motion is **DENIED IN PART** as to Riley's remaining claims against him.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**